FILED

1   GUIDO SAVERI (22349) *guido@saveri.com*
    R. ALEXANDER SAVERI (173102) *rick@saveri.com*
2   CADIO ZIRPOLI (179108) *cadio@saveri.com*
    SAVERI & SAVERI, INC.
3   111 Pine Street, Suite 1700
    San Francisco, CA 94111-5619
4   Telephone: (415) 217-6810
    Facsimile: (415) 217-6813
5
    JULIO J. RAMOS (189944) *ramosfortrustee@yahoo.com*
6   LAW FIRM OF JULIO J. RAMOS
    35 Grove Street, Suite 107
7   San Francisco, CA 94102
    Telephone: (415) 948-3015
8
9   *Attorneys for Plaintiff*

10

2008 MAY 28  PM 2: 52

CLERK U S DISTRICT COURT
CENTRAL DIST OF CALIF
LOS ANGELES

B f _____

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Emilse Magana, on behalf of herself and all others similarly situated,<br><br>              Plaintiff,<br><br>     v.<br><br>FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, CHICAGO TITLE INSURANCE COMPANY, NATIONAL TITLE INSURANCE OF NEW YORK, INC., SECURITY UNION TITLE INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY and STEWART TITLE INSURANCE COMPANY<br><br>              Defendants. | Case No.<br><br>**SACV08-0591 CJC**<br><br>**CLASS ACTION COMPLAINT** (FFMx)<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT



1  GUIDO SAVERI (22349) *guido@saveri.com*
   R. ALEXANDER SAVERI (173102) *rick@saveri.com*
2  CADIO ZIRPOLI (179108) *cadio@saveri.com*
   SAVERI & SAVERI, INC.
3  111 Pine Street, Suite 1700
   San Francisco, CA  94111-5619
4  Telephone:  (415) 217-6810
   Facsimile:  (415) 217-6813
5
   JULIO J. RAMOS (189944) *ramosfortrustee@yahoo.com*
6  LAW FIRM OF JULIO J. RAMOS
7  35 Grove Street, Suite 107
   San Francisco, CA 94102
8  Telephone: (415) 948-3015

9  *Attorneys for Plaintiff*

10

                    **UNITED STATES DISTRICT COURT**
11
                    **CENTRAL DISTRICT OF CALIFORNIA**
12

13 | Emilse Magana, on behalf of herself and all others similarly situated, | ) ) ) | Case No. |

14 | | Plaintiff, | ) ) ) |

15 | v. | ) ) | **CLASS ACTION COMPLAINT** |

16 | FIDELITY NATIONAL FINANCIAL, INC., | ) ) | **JURY TRIAL DEMANDED** |

17 FIDELITY NATIONAL TITLE INSURANCE
   COMPANY, TICOR TITLE INSURANCE
18 COMPANY, TICOR TITLE INSURANCE
   COMPANY OF FLORIDA, CHICAGO TITLE
19 INSURANCE COMPANY, NATIONAL TITLE
   INSURANCE OF NEW YORK, INC., SECURITY
20 UNION TITLE INSURANCE COMPANY, THE
   FIRST AMERICAN CORPORATION, FIRST
21 AMERICAN TITLE INSURANCE COMPANY,
   UNITED GENERAL TITLE INSURANCE
22 COMPANY, LANDAMERICA FINANCIAL
   GROUP, INC., COMMONWEALTH LAND TITLE
23 INSURANCE COMPANY, LAWYERS TITLE
   INSURANCE CORPORATION, TRANSNATION
24 TITLE INSURANCE COMPANY, STEWART
   TITLE GUARANTY COMPANY and STEWART
25 TITLE INSURANCE COMPANY

26              Defendants.

27

28

   CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ...................................................................................................... 1

II. JURISDICTION AND VENUE .............................................................................. 3

III. PARTIES .................................................................................................................. 4

    A. Plaintiff ........................................................................................................... 4

    B. Defendants ...................................................................................................... 4

IV. OTHER ENTITIES .................................................................................................. 8

V. CLASS ACTION ALLEGATIONS ........................................................................ 9

VI. TRADE AND COMMERCE ................................................................................ 11

VII. FACTUAL ALLEGATIONS ............................................................................... 11

    A. The Nature of Title Insurance ..................................................................... 11

    B. Price-Fixing in the Large Markets .............................................................. 13

    C. TIRSA's Formation ..................................................................................... 14

    D. Lack of Regulatory Supervision and Authority in New York and Other States Including California ............................................................... 15

    E. Competition Based on Kickbacks and Inducements But Not Rates ........... 19

    F. Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting ............................................................................. 19

VIII. CLAIMS FOR RELIEF ........................................................................................ 22

    COUNT I Violation of the Sherman Act ............................................................ 22

    COUNT II Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.* ............... 24

    COUNT III (California's Business & Professions Code §§ 17200, *et seq.*) ...... 24

    COUNT IV Unjust Enrichment .......................................................................... 25

PRAYER FOR RELIEF .................................................................................................. 25

JURY TRIAL DEMANDED .......................................................................................... 26

CLASS ACTION COMPLAINT

Plaintiff, Emilse Magana, by her attorneys, on behalf of herself and all others similarly situated, brings this action for treble damages and injunctive relief under the antitrust laws of the United States and based on statutes of the State of California against the above named defendants, demand a trial by jury, and complaining and alleging as follows:

## I.    INTRODUCTION

1.    From the consumer's point of view, title insurance differs greatly from other, more familiar kinds of insurance. For one thing, while automobile and homeowner insurance policies protect consumers from an event that may occur in the future, title insurance offers protection from events that might have occurred in the past.

2.    Most simply, title insurance is protection purchased against a loss arising from problems that occurred in the past and may affect the title to the real estate that a consumer is buying. Title insurers do not compete on the basis of the policies or coverage that they provide. In fact, almost all title policies are based on a single set of form policies published and maintained by the national trade association, the American Land Title Association. Furthermore, the end goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the real value of the title policy which is written to cover only unknown defects in title at the time of issuance. As a result, title insurance is a commodity product.

3.    Even for the savviest of insurance consumers, the purchase of a title insurance policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of paperwork and signings that culminate in the closing of a home purchase. Consumers who normally shop around for their insurance and carefully compare prices, typically emerge from the closing on their new home holding an insurance policy that they know virtually nothing about and that in all likelihood, they will never need.

4.    The title insurance market in California consists of a dozen carriers, ranging in size from regional companies to national affiliates. However, the market is dominated by four groups of affiliated companies which, combined, sell over 85 percent of the title insurance policies sold in

1  California and which own and control the title plants in many California counties that every title

2  insurer must rely on in order issue title policies.

3      5.    Title companies, in marked contrast to property, casualty, life and other traditional

4  insurance carriers, choose not to market their products directly to the consumers who pay for them.

5  Instead, the title insurance industry operates on what is termed a "reverse competition" model.

6  Reverse competition means that title companies solicit business referrals from the other major

7  players in the home purchase scenario – real estate agents and agencies, banks, lenders, builders,

8  developers and others:  middlemen or go-betweens.  The title companies pay middlemen for these

9  referrals in the form of direct payments, advertising expenses, junkets, parties and other kick-backs

10  and inducements.  In addition, middlemen such as Windermere, John L. Scott and Caldwell

11  Banker-Bain, who themselves control a significant portion of the real estate brokerage market, take

12  significant ownership stakes in local title agents and affiliates of the major title insurers and

13  thereby get a direct return in profit from the referral of title business to the title agent whom they

14  partly or wholly own.

15      6.    Reverse competition, as the term suggests, isn't a model that benefits consumers

16  through market-driven forces.  In fact, consumers are bypassed completely as title companies

17  spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders,

18  builders, developers and others in an effort to convince these middlemen to steer their home-

19  buying clients to their companies for their title insurance needs.

20      7.    In some of the major markets in the United States, these same title insurers

21  collectively meet, and jointly set rates and file these rates with the applicable state insurance

22  authority.  The rates are not subject to any meaningful review or regulation.  The companies agree

23  to fix the price of title insurance far in excess of the risk and loss experience associated with such

24  insurance.  As a result of the joint agreement as to rates, competition is relegated to the middleman.

25  As a result of their joint rate setting and agreement, no company competes on price to the

26  consumer.

27      8.    Having agreed to fix prices in states where joint rate setting occurs, the companies

28  agreed to not compete based on price to the consumer in other states, including California, where

CLASS ACTION COMPLAINT

- 2 -

1  regulation of filed rates is lax or non-existent. Thus, they agreed to set rates at supra competitive

2  prices and to compete based on offering inducements to middlemen. In California, in three

3  successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing

4  number" of such inducements that are in violation of state law. However, the OIC does not

5  actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do

6  so. The absence of regulation has allowed collusive behavior and excessive rates.

7      9.      In addition to paying inducements and kick-backs, the title companies and their

8  agents divide the market of real-estate middlemen through the use of Affiliated Business

9  Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership

10 stakes in favored title insurance affiliates. The real estate brokers then reward their associates for

11 using the preferred title insurance providers and lock-out independent title insurers.

12     10.     In this action, plaintiff, on behalf of a Class of those purchasing title insurance in

13 California, seek damages arising from defendants' violations of the Sherman Act as well as

14 California statutory law.

15 **II.    JURISDICTION AND VENUE**

16     11.     This Complaint is filed and these proceedings are instituted under Sections 4 and 16

17 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to obtain

18 injunctive relief and to recover treble damages and the costs of suit, including a reasonable

19 attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the

20 Class which she represents by reason of defendants' and their co-conspirators' violations, as

21 hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1).

22     12.     Defendants transact business, maintain offices or are found within the Central

23 District of California. The interstate commerce described hereinafter is carried on, in part, within

24 the Central District of California and the conspiratorial acts herein alleged were carried on, in part,

25 in the Central District of California.

26

27

28

CLASS ACTION COMPLAINT

**III.    PARTIES**

**A.    Plaintiff**

13.    Emilse Magana is an individual residing in the State of California.  During the Class Period, plaintiff purchased title insurance directly from one or more of the defendants herein and has been injured by reason of the antitrust violations alleged.

**B.    Defendants**

14.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity National does business in California through one or more of its subsidiaries, including but not limited to, defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida,  National Title Insurance of New York, Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company.  Fidelity National is registered to do business in California.

15.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. FNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

16.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor does business in California, is a licensed title insurance company in California and is registered to do business in California.

17.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. TTICF does business in California, is a licensed title insurance company in California and is registered to do business in California.

18.    Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

CLASS ACTION COMPLAINT

- 4 -

1    Chicago Title does business in California, is a licensed title insurance company in California and is

2    registered to do business in California.

3          19.    Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York

4    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

5    NTINY does business in California, is a licensed title insurance company in California and is

6    registered to do business in California.

7          20.    Defendant Security Union Title Insurance Company ("SUTIC") is a California

8    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

9    SUTIC does business in California, is a licensed title insurance company in California and is

10   registered to do business in California.

11         21.    The Fidelity family of title insurance companies (collectively, "Fidelity") – which

12   includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and SUTIC,

13   and their affiliates – is engaged in selling title insurance to purchasers of commercial and

14   residential real estate throughout the United States, including California. Nationally, Fidelity

15   accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly

16   $4.6 billion. Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined below)

17   and since TIRSA's inception have charged title insurance rates in New York that TIRSA

18   collectively sets.

19         22.    The Fidelity family of title insurance companies and their affiliates are wholly-

20   owned and controlled by defendant Fidelity National Financial, Inc. Through its subsidiaries,

21   Fidelity National is a provider of title insurance, specialty insurance, and claims management

22   services. Fidelity National had 2006 revenues of roughly $9.4 billion. The Fidelity family of title

23   insurance companies engaged in the conduct challenged herein with the approval and assent of

24   defendant Fidelity National.

25         23.    Defendant The First American Corporation ("First American") is a California

26   corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First

27   American does business in California through one or more of its subsidiaries, including but not

28

CLASS ACTION COMPLAINT

limited to, defendants First American Title Insurance Company and United General Title Insurance Company.

24.     Defendant First American Title Insurance Company ("FATIC") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

25.     Defendant United General Title Insurance Company ("UGTIC") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112. UGTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

26.     The First American family of title insurance companies (collectively, "First American") – which includes defendants First American, FATIC and UGTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

27.     The First American family of title insurance companies and their affiliates are wholly-owned and controlled by defendant The First American Corporation. Through its subsidiaries, First American is a provider of title insurance, business information, and related products and services. First American had 2006 revenues of roughly $8.5 billion. The First American family of title insurance companies and their affiliates engaged in the conduct challenged herein with the approval and assent of defendant First American.

28.     Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does business in California through one or more of its subsidiaries, including but not limited to,

CLASS ACTION COMPLAINT

- 6 -

defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation

and Transnation Title Insurance Company.

29.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

Pennsylvania corporation with is principle place of business at 5600 Cox Road, Glen Allen,

Virginia 23060.  CLTIC does business in California, is a licensed title insurance company in

California and is registered to do business in California.

30.    Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation

with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.  LTIC does

business in California, is a licensed title insurance company in California and is registered to do

business in California.

31.    Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska

corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

TNTIC does business in California, is a licensed title insurance company in California and is

registered to do business in California.

32.    The LandAmerica family of title insurance companies (collectively,

"LandAmerica") – which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their

affiliates – is engaged in selling title insurance to purchasers of commercial and residential real

estate throughout the United States, including California.  Nationally, LandAmerica accounts for

approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.

Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's

inception have charged title insurance rates in New York that TIRSA collectively sets.

33.    The LandAmerica family of title insurance companies and their affiliates are

wholly-owed and controlled by defendant Land America Financial Group, Inc.  Through its

subsidiaries, LandAmerica is a provider of title insurance and other products and services that

facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

LandAmerica had 2006 revenues of roughly $4 billion.  The LandAmerica family of title insurance

companies and their affiliates engaged in the conduct challenged herein with the approval of

defendant LandAmerica.

CLASS ACTION COMPLAINT

1    34.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

2    headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056. STGC does business in

3    California, is a licensed title insurance company in California and is registered to do business in

4    California.

5    35.    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation

6    with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017. STIC does

7    business in California, is a licensed title insurance company in California and is registered to do

8    business in California.

9    36.    The Stewart family of title insurance companies (collectively, "Stewart") – which

10   includes defendants STGC and STIC, and its affiliates – is engaged in selling title insurance to

11   purchasers of commercial and residential real estate throughout the United States and California.

12   Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006

13   amounted to roughly $2 billion. Stewart was a founding member of TIRSA and since TIRSA's

14   inception has charged title insurance rates in New York that TIRSA collectively sets.

15   37.    Together, defendants account for more than 85 percent of the title premiums

16   consumers pay in California. Nationally, they account for more than 85 percent of title premiums,

17   which in 2006 amounted to roughly $14.5 billion. Throughout the relevant damages period,

18   defendants charged California consumers in California virtually identical title insurance rates.

19   **IV.    OTHER ENTITIES**

20   38.    TIRSA is a voluntary association of title insurers licensed as a rate service

21   organization pursuant to Article 23 of the State of New York Insurance Law. TIRSA maintains its

22   offices in New York City, which until recently were located at the same New York address of

23   Fidelity Title.

24   39.    TIRSA annually compiles from its members statistical data relating to their title

25   insurance premiums, losses and expenses and submits this information in aggregate form to the

26   New York Insurance Department. TIRSA also prepares and submits the New York Title Insurance

27   Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's

28   members. The Insurance Department has never objected to any of the rates TIRSA has collectively

CLASS ACTION COMPLAINT
- 8 -

1    set. Similarly, the California OIC has not actually held a public hearing or conducted any other

2    review or regulation of the title insurance rates in California for thirty years.

3        40.    TIRSA's membership is comprised of defendant insurers and all other title insurers

4    that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica,

5    and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority

6    voting block which, according to TIRSA's by-laws, allows them to control the operations of

7    TIRSA and, in particular, TIRSA's collective rate setting activity.

8        41.    Various other persons, firms and corporations not made defendants herein have

9    participated as co-conspirators with the defendants in the violations alleged herein and have

10    performed acts and made statements in furtherance thereof.

11    **V.    CLASS ACTION ALLEGATIONS**

12        42.    Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the

13    Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons

14    excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who

15    purchased directly, from one or more of the defendants and/or their co-conspirators title insurance

16    for residential and commercial property in California during the four year period preceding this

17    lawsuit and who have sustained damages as a result of the conspiracy herein alleged. The number

18    of potential Class members is so numerous that joinder is impracticable.

19        43.    Plaintiff, as representative of the Class, will fairly and adequately protect the interest

20    of the Class members. The interests of plaintiff are coincident with, and not antagonistic to, those

21    of the Class members.

22        44.    Except as to the amount of damages each member of the Class has by itself

23    sustained, all other questions of fact and law are common to the Class, including but not limited to,

24    the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act

25    (15 U.S.C. § 1) and the effects of such violation.

26        45.    Plaintiff, along with all other members of the Rule (b)(3) Class, were injured as a

27    result of paying supracompetitive prices for title insurance in California. These supracompetitive

28

CLASS ACTION COMPLAINT

prices were achieved as a result of defendants' illegal price-fixing activities and market allocation and division.

46.     Members of the Class include hundreds of thousands, if not millions, of consumers. They are so numerous that their joinder would be impracticable.

47.     Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Rule (b)(2) Class includes all members of the (b)(3) Class, and all consumers who are threatened with injury by the anticompetitive conduct detailed herein.

48.     Defendants have acted, continued to act, refused to act and continued to refuse to act on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

49.     Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of consumers.  They are so numerous that their joinder would be impracticable.

50.     Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law or fact common to the class are the following:

- Whether defendants have engaged in the alleged illegal price-fixing activity and market allocation and division.

- The duration and scope of defendants' alleged illegal price-fixing and market allocation and division activity.

- Whether defendants' alleged illegal price-fixing and market allocation and division has caused higher prices to plaintiffs and other purchasers of title insurance in California.

- Whether the Insurance Commissioner has actively supervised defendants' price fixing and market allocation and division.

51.     Plaintiff does not have any conflict of interest with other Class members.  Plaintiff's claims are typical of the claims of the Class and they will fairly and adequately reflect the interests of the Class.  Counsel is competent and experienced in federal class action and federal antitrust litigation and has been retained to represent the Class.

CLASS ACTION COMPLAINT

- 10 -

52.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible.  The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

53.     There will be no extraordinary difficulty in the management of the Class action.

## VI.     TRADE AND COMMERCE

54.     During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

55.     During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce.  In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

56.     During the period in suit, Class members from locations outside California purchased commercial or residential property and title insurance within California.

57.     During the period in suit, the defendants were the major sellers of title insurance in the United States and California.  Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

58.     The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII.     FACTUAL ALLEGATIONS

### A.     The Nature of Title Insurance

59.     Title insurance is one of most costly items associated with the closing of a real estate transaction.  In California, rates for title insurance are based on a percentage of the total value of the property being insured.  For residential properties, this price ranged in 2005 from about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000 property).  For more expensive homes and commercial properties, these prices are significantly higher.  This amount spent on title insurance has risen dramatically over the past decade.

CLASS ACTION COMPLAINT

1    60.    Title insurance serves an important purpose. It protects the purchaser of a property

2    from any unidentified defects in the title that would in any way interfere with the full and complete

3    ownership and use of the property with the ultimate right to resell the property. Title insurance is

4    required by lenders in most residential and commercial real estate transactions.

5    61.    Title insurance companies operate their business on the premise that consumers are

6    generally uninformed or unaware of all matters concerning title insurance. Consumers are

7    generally not presented, at any time, with an opportunity to make an independent decision

8    regarding any aspect of their propery title. That decision is typically made for them by their

9    lawyer, mortgage broker, lender, or realtor. Consequently, for most purchasers, the cost of title

10   insurance is not challenged. Most consumers do not even become aware of the price they will pay

11   and to which insurer they will pay it until the actual closing of the real estate transaction. By then

12   it's too late, consumers can't attempt to negotiate a better title insurance price or alternate provider

13   for fear of delaying or derailing the entire transaction. There is no shopping around. There is no

14   negotiation of price.

15   62.    This dynamic basically removes the sale of title insurance from the normal

16   competitive process. Unlike the regular forces of supply and demand that keep most industries and

17   their pricing in check, the title insurance industry is not subject to any real competitive constraints.

18   The purchasers of the insurance, in most instances, are not the ones making the purchasing

19   decisions. And, they are certainly in no position to question the price.

20   63.    The most effective, but illegal, way for a particular title insurer to get business is to

21   encourage those making the purchasing decisions – the real-estate middlemen – to steer business to

22   that insurer. The best way to so motivate the middlemen is not through lower prices (that they are

23   not even paying). Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business

24   services and other financial enticements. Therefore, it is through higher pricing (which allows for

25   generous inducements and kick-backs), not lower pricing, that provides the best way for title

26   insurers to compete and increase their business.

27

28

CLASS ACTION COMPLAINT

- 12 -

**B.    Price-Fixing in the Large Markets**

64.    New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA.  There are two principal cost components that go into TIRSA's calculation.  One comprises the risk associated with issuing the title policy.  The other comprises the "agency commissions" paid to title agents.

65.    The risk component covers the risk the title insurer bears for any undiscovered defects in the title.  Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer.  That is because title insurance protects against unknown *prior* events that cause defects in title.  With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policy in the United States amounts to only about 5 percent of the total premium collected.  This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

66.    The "agency commissions" component of the title insurance rate covers payments made to title agents.  Defendants have an ownership or management stake in many of the title agencies to which these payments are made.  A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title.  The search and exam function does not involve the spreading or underwriting of risk, and title insurers typically outsource this task to title agents.

67.    The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance.  These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use.  These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

CLASS ACTION COMPLAINT

- 13 -

1     68.     Under TIRSA's collective rate setting regime, roughly 85 percent of the total title

2     insurance premium is based on the so-called "costs" associated with the payment of agency

3     commissions. Only 15 percent is based on costs associated with the risk of loss.

4     69.     TIRSA publishes its final calculated title rates in the New York Title Insurance Rate

5     Manual. These rates are tied to the value of the property being insured. This is so despite the fact

6     that the costs associated with agency commissions are entirely unrelated to the value of the

7     property. Indeed, agency kickbacks and enticements have little to do with producing a particular

8     title policy and provide no value – proportional to property value or otherwise – to the consumer.

9     Even search and exam costs are unrelated to property value. They instead depend on the age of the

10    property, the complexity of the ownership history, and the accessibility of prior ownership records.

11    70.     There are other states in which the defendants overtly meet and agree to fix the rates

12    for title insurance as part of a formal collective rate setting process.

13    **C.    TIRSA's Formation**

14    71.     Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as

15    the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate

16    setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal

17    Trade Commission ("FTC") challenge to the collective rate setting activity of many of these

18    associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992),

19    where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting

20    activity of these rating bureaus must be actively supervised by the state.

21    72.     In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

22    contended that the respective state insurance departments merely rubber-stamped this portion of the

23    collectively fixed rates without any independent review or analysis of their reasonableness or cost

24    justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was

25    not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to

26    "exercise[]sufficient independent judgment and control so that the details of the rates or prices have

27    been established as a product of deliberate state intervention, not simply by agreement among

28    private parties." *Ticor*, 504 U.S. at 634-35.

CLASS ACTION COMPLAINT

- 14 -

73.     Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the collective rate-setting of certain state rating bureaus was improper because it was not actively supervised by the state.  According to the circuit court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not enough.  Active supervision requires the state regulatory authorities' independent review and approval." *Id*. at 1139.

74.     Defendants formulated TIRSA's first rate manual and procedure soon after the Supreme Court's *Ticor* decision.  Through TIRSA, defendants have set up a rate-setting scheme to get around the rigors of state oversight required by *Ticor*.  They have done so by calculating a single rate that comprises both risk and agency commission costs and by outsourcing to title agents the agency commission costs.  In this way, defendants avoid providing the Insurance Department with any detailed breakout or backup for the bulk of the costs that make up their collectively fixed rates.

75.     TIRSA merely submits an aggregated figure that is supposed to represent the total agency commission costs.  Embedded within this figure is the vast quantity of dollars that are funneled to and through the title agencies as kickbacks, financial inducements and other costs unrelated to the issuance of title insurance.  Defendants' design in all of this has been to effective "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

**D.     Lack of Regulatory Supervision and Authority in New York and Other States Including California**

76.     There is no provision under the New York Insurance Law for TIRSA to include in its collectively fixed rates kickbacks and other agency commission payments unrelated to the issuance of title insurance.  Indeed, the New York Insurance Department has openly acknowledged that it lacks the authority to review any agency commission payments.  It has likewise recognized that defendants' outsourcing of agency commission costs has prevented it from performing a meaningful review of TIRSA's calculated rates.  This was made clear at a November 2006 public hearing the New York Insurance Department held – the first in 15 years – where it questioned

CLASS ACTION COMPLAINT

- 15 -

1  TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup
2  or detail for agency commissions.

3      77.    At the hearing, the Insurance Department conceded that it could not properly
4  evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost
5  information on agency commissions that TIRSA does not provide.

6      78.    The Insurance Department's recognition that it is not properly supervising TIRSA's
7  rate-setting activity is consistent with the April 2007 findings of the U.S. Government
8  Accountability Office ("GAO") that the title insurance industry is in need of greater state
9  regulation. The GAO studied the industry conditions of several states, including New York, and
10  concluded that "state regulators have not collected the type of data, *primarily on title agents' costs*
11  *and operations,* needed to analyze premium prices and underlying costs." (Emphasis added.)

12      79.    Unchecked by regulatory review and insulated from competition, defendants have
13  thus been able to collectively fix title insurance rates at supra competitive levels and earn profits
14  that vastly exceed those contemplated by the Insurance Department or that would have resulted in a
15  free and open competitive market.

16      80.    At the time of TIRSA's formation, the Insurance Department established 5 percent
17  (of the total premium) as the level of profit to which title insurers are entitled. The Insurance
18  Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its
19  revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a
20  reasonable premium. However, without the authority or ability to scrutinize agency commission
21  costs, the Insurance Department has been unable to perform this function. As a result, defendants
22  (through TIRSA) have been able to set artificially high title premiums and secure title profits far in
23  excess of the 5 percent threshold.

24      81.    Through an independent investigation conducted over the past several years, the
25  New York State Attorney General found that for every dollar of insurance premium defendants
26  collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid
27  out in claims. And, of the roughly 85 cents that supposedly covers agency commissions, only
28  between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy.

CLASS ACTION COMPLAINT

These numbers show that title insurers' collectively fixed rates have resulted in profits that untethered to and vastly exceed the costs of producing such policies.

82.    The New York Attorney General's investigation further revealed that what was largely driving these numbers were the kickbacks and other financial inducements defendants were funneling to and through title agents to secure more business. As reported at the New York Insurance Department's 2006 hearing, one title agency's financial statements revealed that it spent more than $1 million of these so-called "agency commissions" on items identified as "Christmas", "automobile expenses", "political contributions", "promotional expenses", and "travel and entertainment". These expenses are not even remotely related to the issuance of title insurance.

83.    A report to the California Inurance Comissioner prepared by Barry Birnbaum, Consulting Economist, in December 2005, found strikingly similar abuses, "We found numerous examples in California of illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals."(*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p. 3)

84.    All of this "excess money" paid to title agents not only works to steer business to defendants. It also serves to boost defendants' own profits through the inflated revenues they obtain to cover these agency payments and through their ownership or management stake in many of these agencies.

85.    Defendants are competitors in the sale of title insurance to consumers throughout the United States. These title insurers have agreed and engaged in concerted efforts to (i) collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the government agencies have no ability or authority to regulate.

CLASS ACTION COMPLAINT

86.    The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of the

Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

competition and questions about the reasonableness of prices including:

- Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have identified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

87.    The GAO visited several states, including California, and found a lack of regulatory

oversight:

In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to oversee title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a

CLASS ACTION COMPLAINT

- 18 -

competitor right of action with no monetary penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

**E.   Competition Based on Kickbacks and Inducements But Not Rates**

88.   Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

89.   In other words, as a direct result of these meetings where rates were agreed to, these same defendants agreed, either expressly or tacitly, to not compete on rates in other states as well. To compete on rates in other states could and would imperil their ability to maintain the agreed rate in states like New York.

90.   As is the case in New York, a lack of regulatory authority over rates created an environment in which a conspiracy can and did succeed.  No agency was examining why all the rates were virtually identical, and no agency was examining whether the costs associated with these premiums were reasonable.  This is an environment which is conducive to price fixing.

91.   In California, there is a lack of regulatory authority and oversight over title insurance companies.  The rates in California are not set as part of a deliberate state intervention and the state does not and cannot meaningfully renew or approve these rates.  The rates at issue in this case went into effect without review.

92.   In fact, in February of 2007, the Insurance Comissioner of California, Steve Poizner issued a statement concluding "that reasonable price competition does not exist for title and escrow services." (*Inurance Commisssioner Steve Poizner Issues Statement Following Decision by OAL on New Regulations*, California Department of Insurance, February 22, 2007)

**F.   Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

93.   In addition to the uniformity of rates, other facts suggest that it is more plausible than not that rates have been set based on an agreement to fix prices.

94.   In theory, the chain of title should be documented back to its historic grant of ownership centuries in the past.  Fear about a possible title defect in the distant past is widely used as a justification by title agencies when convincing property buyers to purchase an owner policy in

CLASS ACTION COMPLAINT

1    addition to the lender policy, which is mandatory to secure a mortgage. The title agency, however,

2    saves much time and money when the search is limited to one or two transactions. They rely on

3    the insurance policy to cover the remote chance of missing an earlier but still-valid claim. If such a

4    claim is asserted and survives the scrutiny of the title insurance company's legal department, the

5    expected cost of compensation is likely to be less than the sum of added overhead costs of

6    routinely tracing back every chain of title to the earliest registered owner in the distant past.

7    95.    Title insurance industry officials tend to justify the large proportion of the premium

8    retained by the title abstract and settlement agency (from 60 to more than 90 percent) by the

9    alleged high cost of title searching back into the distant past. In fact, a high proportion of

10   noncommercial properties are searched only through the most recent transaction. No information

11   is available as to what proportion of claims originate in the distant past. The industry has never

12   published pertinent statistics. It would have a marketing incentive to publish these statistics if the

13   risk were significant; that it has not published these statistics indicates that the risk probably is only

14   slightly greater than zero.

15   96.    Many U.S. homes are being resold three or four times in twenty-five years. At each

16   of these occasions, an abstract of title will be prepared on the basis of a more or less thorough

17   review of the available title records, inheritance records, family records and records of past or

18   current liens against a property. It is reasonable, therefore, to suspect that the risk of a title defect

19   will decrease every time a property is sold.

20   97.    Title searches have become less labor intensive, especially in large urban counties

21   and cities. More and more of the information is available online. The statistical likelihood that a

22   title default would be overlooked is a closely held industry secret, but it appears to be so small that

23   many transactions are now insured on the basis of a search of the last owner's title history or a

24   search into transactions that occurred during the last twenty-five to thirty-five years. The evidence

25   is strong that the title insurance industry has achieved a remarkably high level of loss minimization.

26   Indeed, the national everage recovery for a claim on a title insurance policy is appoximately 5% of

27   the total premium. On the other hand, the national average for property insurance is approximately

28   80% of the total premium collected.

CLASS ACTION COMPLAINT

- 20 -

1    98.    Thus the costs of production have decreased as has the risk of loss yet none of these

2    factors has resulted in price competition at the consumer level.

3    99.    There is a remarkable absence of rate changes by title insurers over the past five

4    years, despite declining costs of production, increased number of transactions and increased

5    revenue per transaction. During a period when costs per unit of production declined significantly,

6    underwritten title companies and title insurers maintained excessive rates. The prices charged by

7    title insurers and underwritten title companies were not and are not responsive to the changing

8    costs of production or increasing revenue per transaction at a given set of rates. Again, this is

9    indicia of an agreement not to compete based on price.

10    100.    As noted, the title companies engage in illegal rebates and kickbacks where the title

11    insurer or the underwritten title company provides money, free services or other things of value to

12    a real estate agent, a lender or homebuilder in exchange for business referrals. These illegal rebates

13    and kickbacks – a consequence of reverse competition – show that title insurance rates are supra

14    competitive and that some portion of the overcharge is passed from the underwritten title company

15    or title insurer to the referrer of business.

16    101.    A lack of competition and the ability to control prices is enhanced by the fact that

17    there were few title insurer entrants over the period from 1995 through 2005 and the number of

18    title insurer groups declined as title insurers acquired other title insurers. There were few

19    underwritten title company entrants over the 2000 to 2005 period and new entrants were controlled

20    business arrangements whose addition to the market did not result in greater price competition.

21    102.    Access to title plants can be a barrier to entry, but a large barrier to entry exists due

22    to the established relationships between the entities that can steer the consumer's title and escrow

23    business and the entities who sell title insurance and escrow services.

24    103.    The title insurance market is highly concentrated – a few title insurers account for

25    the vast majority of title insurance sales – at both the statewide level and at the county level in

26    California. For example, three title insurer groups account for 77.4% of the market at a statewide

27    level. At the county level, each individual market was highly concentrated. The GAO found that

28

CLASS ACTION COMPLAINT

First American and Fidelity had a market share of 66 percent.  Such a concentration enhances the ability of companies to fix prices

104.    The agreement not to compete based on price is also evidenced by the fact that no company has marketed its services to consumers, the ultimate purchasers of the product.  This is in marked contrast to real insurance, for example, car insurance, where the companies compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor," or Allstate's "good hands," or the cute (to some) GEICO gecko promising low prices.

105.    As a result of this lack of competition, California title inturance and escrow services markets have enjoyed excessive profits, "In a competitive market, sellers earn a reasonable profit.  In the California title insurance and escrown services markets, bot the title insurers and the underwritten title companies realized excessive profits over an extended period of time.  In 2003 and 2004, underwritten title companies in California earned after-tax profits of 49.0% and 32.3% respectively – excessive by any reasonable measure." (*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p. 2)

**VIII.   CLAIMS FOR RELIEF**

**COUNT I**

**Violation of the Sherman Act**

106.    Plaintiff incorporates by reference the preceding allegations.

107.    Beginning at least as early as May 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

108.    The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

(a)    to fix, raise, maintain and stabilize the price of title insurance throughout California;

 1           (b)     to fix, raise, maintain and stabilize the terms and conditions of sale of title

 2 insurance in Californi; and

 3           (c)     to allocate and divide the market for title insurance in California.

 4      109.    In the absence of proper regulatory authority and oversight, defendants' conduct

 5 constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to

 6 allocate and divide the title insurance market in California and is a *per se* violation of Section I of

 7 the Sherman Act.

 8      110.    Defendants' price-fixing, market allocation and division activity has been

 9 continuous throughout the relevant damages period and has been renewed and reinforced annually

10 through submissions to the OIC of supposed cost and revenue information and its periodic

11 submissions of rate changes.

12      111.    Through their collective price-fixing, market allocation and division and

13 manipulation of the regulatory process, defendants have harmed competition by charging

14 consumers supra competitive prices for title insurance in California, evidenced in part by the fact

15 that the prices are uniformly higher than compared with the cost of providing the insurance.

16      112.    The aforesaid combination and conspiracy has had the following effects among

17 others:

18           (a)     price competition in the sale of title insurance has been suppressed,

19 restrained and eliminated;

20           (b)     prices for title insurance have been raised, fixed, maintained and stabilized at

21 artificially high and non-competitive levels; and

22           (c)     purchasers of title insurance have been deprived of the benefit of free and

23 open competition.

24      113.    During the period of the antitrust violations by defendants and their co-conspirators,

25 plaintiff and each member of the Class she represents, has purchased title insurance and, by reason

26 of the antitrust violations herein alleged, paid more for such that it would have paid in the absence

27 of said antitrust violations.  As a result, plaintiff and each member of the Class she represents, has

28 been injured and damaged in an amount presently undetermined.

CLASS ACTION COMPLAINT

| | |
|---|---|
| 1 | **COUNT II** |
| 2 | **Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.*** |
| 3 | 114.    Plaintiff incorporates by reference the preceding allegations. |
| 4 | 115.    Defendants conduct as set forth above is in violation of the Cartwright Act of |
| 5 | California (Cal. Bus. & Prof. Code §§ 16720, *et seq.*). |
| 6 | 116.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially |
| 7 | inflated prices for title insurance and have suffered injury to their business and property. |
| 8 | **COUNT III** |
| 9 | **(California's Business & Professions Code §§ 17200, *et seq.*)** |
| 10 | 117.    The preceding paragraphs of this Complaint are realleged and incorporated by |
| 11 | reference.  Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code |
| 12 | §§ 17200, *et seq.*, on behalf of herself and the members of the Class. |
| 13 | 118.    Defendants' statements and representations constitute unfair, unlawful and |
| 14 | deceptive trade practices in violation of the UCL. |
| 15 | 119.    All of the wrongful conduct alleged herein occurs and continues to occur in the |
| 16 | conduct of defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized |
| 17 | course of conduct that is repeated in the State of California on hundreds, if not thousands, of |
| 18 | occasions daily. |
| 19 | 120.    Plaintiff has suffered injury in fact and has lost money or property as a result of |
| 20 | defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance |
| 21 | then she would or should have absent the conduct complained of. |
| 22 | 121.    Plaintiff requests that this Court enter such orders or judgment as may be necessary |
| 23 | to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to restore |
| 24 | to any person in interest any money which may have been acquired by means of such unfair |
| 25 | competition and to disgorge any profits realized by defendants as a result of its unfair, unlawful |
| 26 | and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code |
| 27 | § 3345, and for such other relief as set forth in the Prayer for Relief. |
| 28 | |

CLASS ACTION COMPLAINT

- 24 -

**COUNT IV**

**UNJUST ENRICHMENT**

122.    Plaintiff incorporates by reference the preceding allegations.

123.    This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

124.    Defendant has received a benefit from plaintiff and the Class members in the form of the prices plaintiff and the Class members paid for defendants' title insurance.

125.    Defendants are aware of their receipt of the above-described benefit.

126.    Defendants received the above-described benefit to the detriment of plaintiff and each of the other members of the Class.

127.    Defendants continue to retain the above-described benefit to the detriment of plaintiff and the Class members.

128.    As a result of defendants' unjust enrichment, plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands:

A.    That the alleged combination and conspiracy among the defendants and their co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.    That the Court declare that the premiums charged are excessive under state law and order damages;

C.    That judgment be entered against defendants, jointly and severally, and in favor of plaintiff, and each member of the Class it represents, for threefold the damages determined to have been sustained by plaintiff, and each member of the Class it represents, together with the cost of suit, including a reasonable attorneys' fee;

1       D.     Each of the defendants, successors, assignees, subsidiaries and transferees, and their

2 respective officers, directors, agents and employees, and all other persons acting or claiming to act

3 on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any

4 manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination,

5 conspiracy, agreement, understanding or concert of action, adopting or following any practice,

6 plan, program, or design having a similar purpose or effect in restraining competition; and

7       E.     Such other and further relief as may appear necessary and appropriate.

8 **JURY TRIAL DEMANDED**

9      Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged herein.

10

11 DATED: May 27, 2007.

12 Randy Renick (179652)
Dan Stormer (101967)

13 HADSELL, STORMER, KEENY,
RICHARDSON & RENICK, LLP

14 128 N. Fair Oaks Ave.
Pasadena, California 91103

15 Telephone: (626) 585-9600
Facsimile: (626) 577-7079

16 GUIDO SAVERI (22349)

17 R. ALEXANDER SAVERI (173102)
CADIO ZIRPOLI (179108)

18 SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700

19 San Francisco, CA 94111-5619
Telephone: (415) 217-6810

20 JULIO J. RAMOS (189944)

21 LAW FIRM OF JULIO J. RAMOS
35 Grove Street, Suite 107

22 San Francisco, CA 94102
Telephone: (415) 948-3015

23

24 *Attorneys for Plaintiff*

25 *ti.001*

26

27

28

CLASS ACTION COMPLAINT

- 26 -